May it please the Court, and good afternoon. My name is Philip Clotius, and I represent the Plaintiff Appellant's eight former National Football League players who are suing the league for voluntary negligence. At this point in time, I'd like to reserve three minutes for rebuttal. Thank you. Your Honors, before addressing the questions of class certification, statute of limitations, and causation, I'd like to make two general points that underlie the flaws of the District Court's opinion. The first is that this Court in Dent I and Dent II was crystal clear that our voluntary negligence claim should be limited to the actions of the NFL and the NFL only, and should not conflate them with team doctors and club employees. This we did, presenting in front of Judge Alsop 19 pages of summary evidence and hundreds of exhibits that revealed the voluntary negligence and the actions of the NFL and its personnel. In all three aspects at issue today, Judge Alsop relied on the team doctors and the team trainers, the club employees, that we were specifically told by this panel that we were not to have a role in the claim. Counsel, I've read Judge Alsop's I re-read it, I've read it a couple of times. I re-read your complaint. I read the entire thing today, all 90 pages of it. You've got references to team doctors and team practices throughout this complaint. How can we avoid this? It's part of your complaint. Your Honor, that was because our original claim was negligence per se. I will perfectly concede to you that if we were doing the negligence per se claim, or if we sued the clubs, what he did was appropriate. What Judge Alsop ... This Court in Dent ... Go ahead. This Court in Dent II dismissed the negligence per se claim and left us with a voluntary negligence claim, which at least from our perspective is a very different animal. Yeah. I think what Judge Alsop perceived, and you can tell me why you think he's wrong, is that in order to prove your voluntary assumption theory here, that the NFL somehow voluntarily assumed that you're going to have to show that with respect to each club, that the clubs behave differently, that they had different responsibilities than when the NFL undertook to monitor. It wasn't like they were just using just standard software, like you would your income tax, and had everybody fill out the same forms. Each of the clubs had different practices. They had different doctors. They dispensed different medications. That comes through loud and clear from your complaint. It came through if we were doing negligence per se. That's correct. The voluntary negligence evidence ... I'm not so sure, counsel. How could the league audit each of the 32 clubs without looking to the behavior of the doctors and the trainers in distributing controlled substances? The issue as we see it is the NFL set up the system through their voluntary actions that allowed the clubs to believe that this was legal. The question would be, what did the audit show? If the audit revealed abnormal findings, what action, if any, did the league take to address those abnormal findings? The audits gave volume of drugs. Again, they were exhibits to our complaint. The NFL would then send out members of NFL security to go to the clubs and to see if there's a discrepancy between what the club reported and what was in the medical logs. That then came back, and then Dr. Brown, who's the 30-year head of this drug committee, would then issue what he called the discrepancy report, about whether there were any discrepancies between what they saw on the log book and what they reported. Dr. Brown and Dr. Pellman, the two medical drugs who were employees of the NFL, both admitted, as did the teams, that no action was ever taken as a result of an audit. They simply noted the deficiencies and left it at that. Our perspective is, the issue in voluntary negligence is simply, was that reasonable? Was it reasonable to compile documentation of thousands and thousands of medications and then do nothing? To get to that point, we don't need to talk about the clubs and the doctors and the trainers. Your Honor, getting back to Judge Bybee's question, there's an important question here from our perspective as to where's the place of the wrong? Where did the defendant do wrong? Judge Alsop assumed that the wrong was the handing of the pills from the doctors to the players. Our argument in front of Judge Alsop and our place of the wrong was New York. That's where the NFL is headquartered. That's where all the decisions were made. That's where all of the voluntary negligence happened. This is all emanating from NFL headquarters in New York. The injury is not the handing of the pills to the players. Your Honor, the club doctors and trainers are just minions. That seems to interfere with your theory of causation, does it not? Because your theory of causation has always been over prescription of drugs in order to keep marquee players on the field to maximize television revenues. I don't see how you could audit a team to determine compliance with drug laws without asking pretty basic questions about why were these players supplied with these particular medications. Your Honor, if I might, you're looking as Judge Alsop did. Judge Alsop looked almost exclusively at the record keeping and the audit provisions. That's what he focused on. In doing so, he ignored hundreds of exhibits and hundreds of pages that we submitted that the voluntary negligence was so much more than that. For example, how is it that all of these doctors acknowledged that they would never give this level of drug to their normal patients, their non-NFL patients? Why did they do it? The answer of every one of them, including Brown and Pellman, who are from the NFL, was that the NFL was a unique clinical environment. That was a theory that was published in the 70s by the first director of the NFL Drug Committee. That theory was used to justify all of this. The NFL propagated it. The NFL told the clubs that this was the right theory. Everybody bought it until the DEA told them that it wasn't, that there was no special NFL cultural standard that would justify this level of medications. The other thing that happened, which again Judge Alsop did not talk about, from the very beginning, the Drug Advisory Committee told the clubs that one of the reasons they were there was to give them legal advice to ensure compliance with state and federal statutes. It's in the We don't have to get into the handing of the pill to the players to go back and say they're negligent. They assume the duty to give clubs legal advice and they were negligent in doing it because they never did anything. Again, there's so much more going on here than just the audit and the record keeping. And Judge Alsop ignored it all, even though again we had hundreds of pages of exhibits to support what we're saying. And the negligent legal advice was given by who? The NFL. Yeah. Do you have a person? The audits and all the documents that come out of the committee. The legal advice, I suspect you need to tell me that's going to be a lawyer, right? Correct. Okay, so you have lawyers that you're prepared to name at the NFL? I can tell you what happened. All of this, all of it, the audits and the record keeping are copied to the NFL Security Council office. They do the audits to various vice presidents, depending on who is in office, when, and the NFL Management Committee, which are the lawyers in the NFL. And occasionally, Jeff Pash, who's general counsel. So again, this is not simply a record keeping with Brown and Pellman. They're all talking constantly. They're all meeting together. All of those lawyers are at the conferences where they have their annual meeting at the combine. I mean, I've got to say, I am really, really confused. I am very confused by what was in your brief, what the judge also thought he was doing, because it just feels like your theory just keeps shifting. It certainly shifted from dent one to dent two. It's shifted from dent two to dent three. And now it feels like it's shifted again under my feet. So I'm just being honest with you. I'm very, very confused. So maybe you can help me out of the woods. You shifted us. You shifted us from negligence per se to voluntary negligence. You didn't have a negligence per se claim so that we could have just stopped it there if you wanted to rest on that. But you didn't have to. And you're also overlooking the causation evidence, which the district court focused on, particularly with respect to the opinion of Dr. Benet. I mean, he didn't examine any of the plaintiffs. He did not. He didn't review their medical records. He did not. I'm sorry, he did not. This type of prescription behavior could have been a cause to a reasonable degree of medical certainty of the injuries that they suffered. But he doesn't rule out other potential causes for some of the ailments that these plaintiffs claim to be suffering from. So why was the district court wrong in finding that you basically failed in your proof to establish a prima facie case of negligence? Dr. Benet is the nation's leading expert on the drugs. He's a pharmacologist. He's not a medical doctor. He's a doctor. We didn't get a doctor. We got him because he's the only one, we thought, that had a grasp of all this. I mean, again, this is a complex... Counsel, this is a big case, a very, very high-profile case. Everybody spent a lot of money and a lot of time, including this case. His credentials are extremely impressive. If there's a Nobel Prize in pharmacology, Benet's high on that list, okay? No question. His credentials are not to be disputed, but they are limited in the area of pharmacology, and the states require some proof to a medical certainty. And I don't see any... I wouldn't see anything wrong with having Benet come in and say, look, here's what the lay of the land looks like, and then have a doctor come in and say, I've examined Jim McMahon, and I've looked at his records, and this is what I can tell you to a medical certainty. And this is consistent with what Dr. Benet has said. We didn't get any of that. We didn't get any of that. We didn't make any effort to get down, other than having Benet look over their depositions and some records. But he's not a doctor, and he tries to stay within his tracks, and that's a problem. Your Honor, you're correct. We did not bring in a medical doctor. One of the reasons we didn't is because there are no studies that deal with this volume of drugs. There's no studies that deal with the commingling, and the medical doctors will tell you that. One of them told me they wouldn't do this to lab rats. He wouldn't believe that this happened. So you can't let the NFL benefit from the fact that their conduct was so egregious that there's no medical way to tell you what the effects are going to be, except the obvious ones, which come from the black box warning. Why couldn't a medical expert, had you endorsed one, examine the plaintiffs, review their medical records, and then render an opinion that based on the contents of those records and the evidence of the oversupplying of prescriptions, that the injuries that they are now complaining of were to a reasonable medical certainty caused by overprescription of drugs and failing to properly inform the patient of the consequences of taking such large quantities? Your Honor, we worried they would not be credible because there are no studies to back that up, but the obvious backs it up. Counsel, we're not at trial here. We're still in the pretrial stage, and the only question that we're wrestling with here is, where is the evidence to overcome the dismissal orders that the district court has entered for want of sufficient proof? Until you clear that hurdle, you don't get to trial. Your Honor, in our reading of the standards, no state is requiring us to deal with every hypothetical possible reason why this could happen. The district court held that there were other causes than the drugs for the conditions. And as I read the Bennett Declaration, all he can say is that this type of behavior would cause injury, but what he can't say is with respect to each individual plaintiff, and I can rule out no other causes other than overprescription. Your Honor, this is classic NFL strategy. You notice they've never given us any possible other cause. They say they don't know. That's not their burden, Counsel. This was your burden. I find that the paucity of medical studies is sort of a poor excuse. You know, we have litigation all the time in which parties have to go out and sort of blaze their own trails. You had to go out and find, it was your job to go and examine one of your six plaintiffs and say, I have gone over this comprehensively. I have read the work of Dr. Bennett. And as a medical doctor and looking at all of these things, I'm going to tell you that this football player's injuries today are a direct result of X, Y, and Z. I mean, the evidence that you've produced about the number of pills is staggering. It is shocking. Um, and so you were off to a good start, but you didn't connect all the dots. And I think that's a, I think it's a serious problem. Your Honor, in light of the obvious black box warnings and the other obvious results of taking things in his value, we didn't think we needed to. Your Honors, I would also point out that if the class action is reinstated, everybody agrees that Bennett's declaration satisfies the general causation requirement. This is only relevant in the individual case of three of them. If the class action is reinstated, which we think it should be for a number of reasons, right, there's no problem here with commonality, even though the district court judge basically threw out the case because he said there was a lack of commonality here. Can you clarify a question I have in terms of what was before the district court? You make a representation in your briefs to us that a comprehensive state by state survey and analysis of the law and the medical ethical standards were provided to the district court. Can you tell me where in the record I can find that comprehensive analysis? Your Honor, I don't think we said that, but I can tell you exactly what's before the district court. Commonality leads you to a three-part California choice of laws test. The first prong of the test is... My question is pretty focused. I'm getting there. I want to know where in the record I can find... In front of the district court, here's the result of the legal research that we have done in analyzing the laws and the medical ethics from all the states that are involved in this putative class. In our class certification brief to Judge Alsop, we argued New York, Arizona, California, and Illinois. We did that because New York was the site of the wrong, and California, Arizona, and Illinois were the residencies of... But you've got putative class members who played in other states for other clubs, and there's no analysis that I could find of the law in those states. There isn't until oral argument. Oral argument before us or oral argument before the district court? Court Judge Alsop. So you made basically an oral representation without filing anything in writing. He notes it. We did it, and you can rely on us. He notes it in his opinion on page 15. Okay. All right. That answered my question. Sorry. We've taken you quite a bit over time. If either of my colleagues has more questions, we'll make sure you have some time for rebuttal. Thank you. May it please the Court. Pratik Shah for the NFL. Judge Tallman, let me just go to your question that we ended the colloquy with just now. It is clear from the district court's opinion, and finally they admit, not in their opening appeal brief, but in their reply appeal brief after we noted it, they admit they did not do any survey of the 23 potential jurisdictions at law. They only briefed four states. Judge Alsop called them out at oral argument on that. They said, no, Judge, we briefed all 50 states. He said, no, that's not true. And so this circuit has controlling law in Lozano in the class certification context that it is the plaintiff's burden to show, to negate any variation when you have so many jurisdictions involved. They clearly didn't do it. It's the worst form of waiver. They didn't do it, and then they denied not doing it. And then finally in the reply brief on appeal, they admitted it. And of course, we briefed it in the district court. We briefed it again. There are variations in the law, but you don't even get there. That is an independent basis to deny class certification in and of itself. Again, I think our case law says there's no independent obligation on the part of the district court to do their work. Exactly. That's exactly what Lozano says. Lozano from this court says the burden is not on the district court to do a 50-state survey. It's on the plaintiff to do that. That's just one of three independent bases for denying class cert. You can stop there. You can also go to the point that both you and Judge Bybee raised that the voluntary undertaking that they now assert after this court in Dent 2 shot down the per se theory, the voluntary undertaking theory is about proper record. The NFL had a duty to ensure the proper recordkeeping, distribution, and administration of drugs by the clubs. And so Judge Alsup logically said, of course we look at the NFL, what they did. They did audits. They did policies. But we have to also look at whether they, in order to determine whether the NFL breached the duty, we need to know whether a club was handling drugs in an improper way or not. And the evidence, the undisputed evidence in the record which has cited the opinion at page 65 is that some clubs were doing a fine job complying with everything and some not so well. So just to take a simple example, the NFL would not be breaching its duty with respect to Team A if the audit showed that Team A was in, in fact, compliance with all of the standards. Perhaps it was breaching it with respect to Team B that wasn't doing so well. So there is club by club variation, 32 different teams over 35 seasons, and it varied season to season. So that, the district court did not... It could have variation among an individual club over several seasons. Exactly, because it changed. The practices changed over time. It's certainly not an abusive Judge Alsup to say, look, it would be a train wreck to expect 32 different findings over 35 different seasons all in one class. The third independent reason to deny class cert is the superiority finding. This is a 23C4 class. This court in its Valentino decision at pages 1234 and 1235 of that decision said in a C4 class, the district court still has to do a superiority finding. That is, would a class certification be a superior method of handling it as opposed to alternative methods? Judge Alsup in detail, and this is at ER pages 70 and 71, goes through and why, under the circumstances of this case, it would not be superior to do this as a class action. The fact that there would still need to be up to 15,000 trials, not just on damages, but also on specific causation. The fact that these were large dollar claims. The fact that you could use collateral estoppel. All of these things, they do not address that superiority finding in their opening brief. And then when we point that out in their reply brief, on page 9, they drop a footnote and say, Judge Alsup didn't do a superiority finding in the class with respect to the 23C4 class. On pages 70 to 71, Judge Alsup cites Valentino, does the superiority finding. It's just flat wrong to say that he didn't do that. Certainly not an abuse of discretion for him to do that. They don't address it. Three independent bases to reject, to affirm the rejection of class certification here. As to specific causation, Judge Tallman, Judge Bybee, both of you are correct. The expert report that was prepared for this litigation, which is in the ER at pages 78 to 103, it's only 25 pages, there is no specific causation opinion in there by Dr. Bennett. He does not go through each individual plaintiff, the other causes, and counsel for the other side misspoke when he said the NFL did not put in evidence of alternative causes. It wasn't our burden, but the NFL did it anyway. It's on page 67 of our brief with record citations for each of the three plaintiffs, Wiley, Dent, and Hill, each had an alternative cause. And in fact, their own expert, Mr. Bennett, acknowledges that their alternative cause, for example, for the kidney injuries, he said a traumatic hit during a game could be an alternative cause. But he says he didn't rule that out because, and this is at deposition, he expressly disclaims giving a specific causation. This is at SER page 80. He says answering specific questions related to individual players, quote, was not what I was asked to do. And he also, on page SER 83, and this is at transcript pages 90 to 91, he says he did not attempt to rule out other causes like that kidney example that I just gave. There is good reason why Dr. Bennett admits in his depositions that he didn't do that. That's because he wasn't asked to do it. And the procedural posture here I think will help illuminate why plaintiffs didn't get that specific causation opinion. What happened was the expert report deadline was coming due around the time of the class certification decision. So plaintiffs moved to extend the deadline for their expert report because they told the district court, look, if you grant class cert, then we don't have to do specific causation because class cert was only on duty, breach, and general causation. And so they said, please extend the deadline because it'll, if you deny class cert, then obviously we need to address it. They filed that motion, and this is SER 504 is the page. Judge Alsup denies the motion, but here's what he said. Quote, plaintiffs should proceed on the assumption that a class will be certified, i.e., you can just address duty, breach, general causation, not specific causation. If it is not certified, plaintiffs may be granted leave to file an amended expert report with respect to the individual plaintiffs. End quote. So Judge Alsup made a concern and said, look, if I deny class cert, come back to me and you can amend it to actually address specific causation with respect to the eight individual plaintiffs that are left in the case. But they never came back to him. They never sought to amend that expert report to then fill in the gap with respect to the eight individual plaintiffs. That is why the expert report you have doesn't have specific causation. That is why their expert admitted in deposition he wasn't asked to do that when he was providing his expert opinion. If there are any questions on the statute of limitations, I'm happy to address it. Otherwise, we're also happy to rest on our papers and Judge Alsup's opinions. I don't see any questions, so thank you very much, counsel. Thank you, your honors. I think we'll put two more minutes back on the clock for rebuttal time. Thank you, your honors. I'd like to address again the question of what happened in front of Judge Alsup. I did not represent in front of Judge Alsup that we had done 23 jurisdictions. I knew full well we had not. The reason we had not is because of the definition of the situs of the wrong. We believed, and we were right, that the wrong occurred in New York, and there was no need to do 23 jurisdictions. California law says you have to deal with the place of the wrong and the place of residence, and we did that. We dealt with the place of the wrong, and we dealt with the resident for the name plaintiff. How do you handle the traumatic injury of a football player who is hit in a game somewhere besides New York City and treated however they would have treated him, and who now says that my injury was exacerbated by the administration of these drugs or masks? How do we? I mean, I just, I don't understand your theory as to why you're totally ignoring, because we've got a combination of internal injuries that didn't manifest themselves until later. I'll call them chronic illnesses, and then you've got evidence that some of the injuries were, and the kidney example is a good example of one, that clearly were suffered on a date and time where the plaintiff would have known the day that he sustained the injury that he had been injured. Your Honor, he may have known he'd been injured, but that doesn't mean you know anything about the NFL's wrongful conduct. But part of your case was that he was so doped up before he went into the game that he might not even realize as a result of the injury how badly he was injured. Correct. Right? So how can the situs of that wrong be in New York if it occurred in Buffalo or Cincinnati? Your Honor, we took the opinion in Dent 1 and Dent 2 very seriously, and in that opinion, you clearly told us to not focus on the clubs and the doctors and the trainers, but to only focus on the NFL and its employees because that was part of the negligence per se that we lost. We took that seriously. We did not realize that we would then come back and lose class cert and lose statute of limitations and lose causation because of the clubs, doctors, and trainers, which is specifically what you told us was no longer involved in the case. So I guess we're confused, Your Honor. We thought we were doing exactly what you told us to do in Dent 2, which was to focus only on the NFL and its activities. I believe the phrase you used was not conflate that with the doctors and trainers. And then we turn around and we lost everything based on the doctors and the trainers again. I don't see how that can be the case, Your Honors. Thank you, Counsel, taking over again. But this case is submitted as of this date. We thank both sides for their arguments, and this court is adjourned. All rise. This court for this session stands adjourned.
judges: TALLMAN, BYBEE, VANDYKE